IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| LAWRENCE W. HAMBY<br><br>Plaintiff(s),<br><br>vs.<br><br>JOHN BALDWIN, JERRY BARTRUFF,<br>SHERYL DAHM, JAY NELSON, NICK<br>LUDWICK, REBECCA BOWKER, MIKE<br>SCHIERBROCK, DAVID DEGRANGE,<br>RANDY VANWYE and NIKKI EAVES,<br><br>Defendant(s).[1] | 4:15-cv-00276-JAJ-HCA<br><br><br><br>REPORT AND RECOMMENDATION |

Plaintiff Lawrence W. Hamby ("Hamby") initially presented a motion for expedited preliminary injunctive relief [6] and a motion for expedited order of protection and appointment of third party representative [7] to the Court. Defendants responded to the motions. [15, 16]. The Court conducted an evidentiary hearing on the motions on March 29, 2016, and June 29 and 30, 2016. By agreement of the parties, the Court also will decide the merits of the case based on the evidence presented at those hearings. The Court therefore will treat Hamby's motion for preliminary injunction as a motion for permanent injunction. Fed. R. Civ. P. 65(a)(2). The case was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Hamby's

---

[1]Hamby also named Julie Johnson, Debbie Nichols, Jill Johnson and Debbie Ferril as defendants. The State did not accept service on behalf of Julie Johnson, who is no longer an employee of ISP. None of these defendants were served. At a February 3, 2016, status conference, plaintiff's counsel requested additional time to make service on those defendants and was going to confer with the State with respect to which defendants remain in or should be added to the case. No evidence was presented with respect to the involvement of these un-served defendants and they should be dismissed as defendants.

constitutional claims are brought pursuant to 42 U.S.C. § 1983 and his RLUIPA claims arise under 42 U.S.C. §§ 2000cc-1, *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4). The Court will decide the case based on the hearing record and the briefs filed by the parties.

Preliminarily, the Court agrees with defendants that no evidence was offered in support of claims against defendants Bartruff, Baldwin, Dahm, Bowker, Ludwick, DeGrange, VanWye, or Eaves.[2] Therefore, the Court recommends they be dismissed as defendants.

## I.    BACKGROUND

Hamby is an inmate of the Iowa State Penitentiary in Fort Madison, Iowa. Defendants are sued in their capacity as current or former employees of the Iowa State Penitentiary or Department of Corrections. Hamby filed the present action as the founder and leader of the Messianic Jewish Services Group, a religious group situated within the Iowa State Penitentiary in Fort Madison (ISP). He alleges in his complaint that he adheres to "Ultra Orthodox" or Chasidic practices under Jewish law. (Complt. [1] at 4-5). Hamby generally claims that he has been denied certain religious accommodations by Defendants. He also challenges the constitutionality of prison rules relating to religious accommodation. He asserts violations of his free exercise rights under the First Amendment to the United States Constitution and his due process and equal protection rights under the Fourteenth Amendment. Construed liberally, Hamby's Complaint also includes claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-1, et seq. He seeks compensatory, nominal, and punitive damages for all allegations in his

---

[2] The state also mentioned Cynthia Phillips as a defendant who should be dismissed but she has never been named in the caption of any filings, only mentioned in factual allegations. The Court does not consider Ms. Phillips to ever have been a defendant in this lawsuit.

Complaint, as well as attorneys' fees, copy fees, and costs, and declaratory and injunctive relief requiring prison officials to satisfy his requests for religious accommodation.

Prior to the evidentiary hearing, Hamby narrowed the issues for which he seeks injunctive and monetary relief to the following three issues: (1) he has been denied an Orthodox or Ultra-Orthodox non-vegetarian kosher diet and kosher for Passover diet and seeks a kosher kitchen within the institution; (2) he has been denied proper dates and times for holy day worship services; and (3) he requests that Kehot Publications be an approved vendor for religious literature.[3] [27]. Hamby's proposed findings and brief, however, focused only on the kosher diet/kitchen issues. "Arguments raised but not briefed are deemed abandoned." *Knutson v. Ag Processing, Inc.*, 273 F. Supp. 2d 961, 998 (N.D. Iowa 2003), *rev'd on other grds*, 394 F.3d 12047 (8th Cir. 2005)(citing *Bickel v. Korean Air Lines Co.,* 96 F.3d 151, 154 (6th Cir.1996) (holding that arguments not fully briefed are deemed abandoned)); *In re Perry Hollow Mgmt. Co.,* 260 B.R. 58, 65 n. 8 (D.N.H. 2001)). The Court will therefore focus on the kosher diet/kitchen issue only as Hamby has abandoned the worship service and publications issues. Furthermore, to the extent Hamby seeks monetary damages, those claims are barred by 42 U.S.C. § 1997e(e). If Hamby prevails on his kosher diet/kitchen issues, he could be entitled to injunctive relief and attorney's fees under the statute.

## II. FACTS

Hamby testified that his religion is Hasidic Judaism with a Messianic leaning. He was raised by his grandparents, who were Lutheran. Hamby learned his biological father was ethnically

---

[3] In his original Complaint Hamby raised a general constitutional challenge to IDOC's approved vendor list. (Complaint [1] at 16). In the group grievance submitted February 3, 2014, Hamby and affiliated group members requested the IDOC remove the approved vendor list. (Def. Ex. F at 4).

Jewish when his father died in 2003. At that point, Hamby became interested in Judaism and began to identify as Jewish. Hamby testified that when he arrived in prison in 2006, he identified as Jewish. On cross-examination, the state questioned Hamby about a form he filled out when he arrived in prison in 2006, on which he self-identified as Christian. Hamby responded at the hearing that there was not a box to check to identify as Messianic Jewish, so he checked the box for "Christian." (Tr. Vol. I [31] at 69). Hamby further testified that he has studied and continues to study various forms of Judaism. Hamby has a beard, wears the traditional *peyot*, or sidelocks, in his hair, and also wears a *kippah*, or skullcap.

Hamby started the Messianic Jewish Services Group in 2009 and filed a Request for New Religion in June 2010. (Ex. O at 2-3). Richard Jenkins, the Acting Statewide Religious Coordinator at the time, approved placing the Messianic Jewish group on the schedule at ISP. (*Id.* at 46). At one point Hamby attempted to have his group's name changed to "Yavneh." Yavneh practice, Hamby testified, allows Messianic Jews to study and practice with the group, as opposed to traditional Orthodox practice which does not. (*Id.* at 9-10). The institution denied the request and the group continues under the Messianic Jewish name.

The religious practice for which Hamby seeks relief relates to his kosher diet for daily and holiday meals. There is currently a vegetarian kosher diet offered as the result of another case, *Walker v. Iowa D.O.C.*, 4:03-cv-40038-JEG-RAW (S.D. Ia. Feb. 8, 2011). Hamby wants meat in his kosher diet. At hearing Hamby testified that he requires a kosher diet that is "ritually pure," meaning that animals are slaughtered properly under the observance of a rabbi with blood drained out of the carcass and removal of certain parts of the animal and vegetables are prepared according to religious practices. (Tr. Vol. I [31] at 16). Furthermore, there should be at least a six-hour

window between consumption of meat and dairy. (*Id.* at 23). Hamby emphasized that he requires food that has been prepared by either a rabbi or a properly trained Jewish individual and that if it is touched by a non-Jewish person (or "goyim") it loses its kosher quality. (*Id.* at 18-20).

Hamby contends that the kosher diet currently offered at the prison may conform to the requirements of other Jewish inmates, but does not conform to his religious requirements. He requests a separate kosher kitchen overseen by a rabbi trained in food law where foods are not touched by non-Jewish individuals and the food preparation complies with the ritual slaughter, vegetable preparation, and separation of meat and dairy requirements, and also with FDA requirements. For holiday food, Hamby's group has been advised that Hy-Vee is the only vendor available to them for kosher food. Hamby does not believe Hy-Vee prepares its food in a kosher kitchen or with Jewish individuals as the sole food preparers. (Tr. Vol. I [31] at 25).

There is an organization in Florida, the Aleph Institute, which Hamby testified might assist with the kosher kitchen issue and asked that the Court appoint that organization and a rabbi from an unspecified local Chabad institute to advise and provide the definitive authority in all Jewish matters. (Tr. Vol. I [31] at 27). Hamby did not know how much it would cost for these organizations to come in as requested and speculated Aleph might have a grant that would provide the service for free. (*Id.* at 32). Hamby believes that in response to another lawsuit ISP formerly set up a kosher kitchen for another inmate, Glendale More, who is now at Newton Correctional Facility. (*Id.* at 35).

On cross-examination Hamby admitted when he first re-entered the prison system in 2006 he identified as a Christian because he said he did not have the option to identify as Messianic Jewish. (Tr. Vol I [31] at 69). He grew up in a Christian household with his grandparents, not

knowing until 2003 that his father was Jewish. (*Id.* at 70). He testified that up until 2012 or 2013 he told the prison he was Messianic Jewish, but asked for his status to be changed to Hasidic. (*Id.* at 71). Hamby has requested several times that his group name be changed to Yavneh (presumably to distinguish it from the practice of Messianic Judaism) but the request has been denied and his group remains named Messianic Judaism. (*Id.* at 72). He testified his group follows Hasidic Judaism, an Ultra-Orthodox Judaism with a mystical stance. (*Id.* at 73).

With respect to Hamby's adherence to a kosher diet while he has been in prison, he testified he has done so during Passsover, but otherwise has not because the prison "has forbidden it." (Tr. Vol. I [31] at 74-75). There are kosher items in the prison commissary but Hamby testified he is forbidden from eating the items labeled halal kosher. (*Id.* at 75). Hamby testified "halal" is Muslim and he does not eat halal items. (*Id.*) He agreed he has sometimes ordered non-kosher items from the commissary, but only when he had no choice. (*Id.* at 76-77). Hamby testified the kosher diet offered by the prison does not conform to his definition of a kosher diet. (*Id.* at 79). He agreed the prison offers a vegetarian diet but he has requested a non-vegetarian kosher diet. (*Id.* at 81). He has grieved the diet issue and appealed the prison's response to the Statewide Spiritual Activities Review Committee, which denied his appeal on June 10, 2014. (Def. Ex. F at 45, 54-55, 74).

Hamby testified that the "Keith Walker"[4] kosher diet offered by ISP is not a kosher diet in accordance with Hamby's beliefs. (Tr. Vol. I [31] at 84). He requests ISP provide him a non-vegetarian kosher diet year-round at the prison's cost. (*Id.* at 85). As for the kosher meals provided over Passover, Hamby testified they did not meet kosher standards as they were prepared in a "defiled" kitchen nor did he believe they met FDA nutrition standards. (*Id.*) He testified he liked

---

[4] Order Adopting Report and Recommendation, *Walker v. Iowa D.O.C.*, 4:03-cv-40038-JEG-RAW (S.D. Ia. Feb. 8, 2011).

the meals, however, he took issue with their caloric intake and that they were prepared in a non-kosher kitchen. (*Id.* at 86).

Mike Schierbrock, the associate warden of treatment at ISP, was called to testify in plaintiff's case in chief. Mr. Schierbrock does not have rabbinical training and has gone to the internet and Messianic communities in Iowa for information. Mr. Schierbrock provided an overview of the religious accommodation process and the religious grievance process in general terms, referring to Defendants' Exhibits C, D and E, the Religious Programming policy. The religious accommodation/new religion process starts with Form OP-RP-01 F-1, "Request for New Religion, Religious Group or Religious Assistance." (Def. Ex. C at F-1). In response to an offender request, the institution reviews and investigates the request and the practices requested and then forwards the request to the Statewide Spiritual Activities Coordinator with the institution's recommendations. (*Id.* at 4). If the offender is not satisfied with the decision of the Statewide Spiritual Activities Coordinator, he/she can appeal to the Statewide Spiritual Activities Review Committee. (*Id.* at 5). The decision of that committee is the final decision for exhaustion purposes. Once a religion is established, there is a separate religious grievance procedure contained in the Religious Programming policy for an inmate's religious concerns, which is initiated by informal resolution, proceeds to a formal grievance on Form OP-RP-01 F-3, continues to the Statewide Spiritual Activities Coordinator if the inmate is dissatisfied with the outcome of the grievance at the institutional level, and from there to the Statewide Spiritual Activities Review Committee, again the last step in the review process. (*Id.* at 5-6).

With respect to Hamby's request for a non-vegetarian kosher diet and a kosher kitchen, Mr. Schierbrock testified ISP had a court-approved kosher diet (from the *Walker* case) which

Hamby could order as well as ordering kosher items from the commissary. (Tr. Vol. II [42] at 147). Hamby has never requested the *Walker* kosher diet. (*Id.* at 149). Mr. Schierbrock's understanding of Hamby's request is that Hamby wants meat on the kosher diet. Since meat is a protein, ISP has provided peanut butter and beans as a protein. (*Id.* at 152). Mr. Schierbrock had no security justifications for not providing kosher meat nor had he explored cost as an issue because a court-approved kosher diet was already in place. (*Id.* at 152-53). Mr. Schierbrock had not researched the kosher kitchen request as he believed Hamby had not exhausted his remedies on this issue. (*Id.* at 155). As for kosher food for holidays, the institution uses Hy-Vee for all religious holidays as it is the only vendor in the area that does large quantity cooking and which will allow the food to be charged instead of paid for up front. (*Id.* at 157-58). Mr. Schierbrock did not know if Hy-Vee was a kosher vendor. (*Id.* at 156-57). When asked if there were any security concerns about obtaining a kosher vendor, he noted any vendor would have to adhere to the institution's security conditions and if they could meet those conditions, there is no reason why ISP would not approve a vendor. (*Id.* at 157). The institution utilizes Aleph Institution to provide pre-made kosher meals for Passover. (*Id.*)

On cross-examination Mr. Schierbrock agreed there was a brief period of time when ISP put tuna in the kosher diet as a substitute for peanut butter, explaining that some kosher tuna came in and they set it aside specifically for that use. When the tuna supply ended, ISP returned to peanut butter. (Tr. Vol. II [42] at 166-67). He testified ISP does not have control over which kosher food comes to the institution, aside from the Mealmart meals purchased from Aleph. (*Id.* at 167-68). Mr. Schierbrock testified the ISP kosher diet only would be provided to inmates who require such a meal as a tenet of their faith. (*Id.* at 169).

In an affidavit filed following the hearing, Mr. Schierbrock stated the *Walker* diet offered by the prison is not just for one sect of Judaism but meets rabbinical standards for all sects of Judaism. He pointed to Exhibit P as containing a current list of kosher food items available from the commissary. Exhibit Q is a list of commissary items Hamby purchased between March 31, 2015, and March 31, 2016. Mr. Schierbrock stated in his affidavit that he has contacted representatives from Aleph about assisting with Messianic Jewish issues in the prison and Aleph has declined to assist as they do not consider Messianic Jews to be Jewish. (Affidavit [48-1] at 10-12). Mr. Schierbrock also stated that Hamby's claim to be a Hasidic Jew is contrary to materials he has received from Hamby in the past; that Hasidic Judaism is an Ultra-Orthodox sect which does not recognize Messianic Jews. (*Id.* at 13). Hamby has never requested the prison schedule a new faith called Hasidic Judaism and has never attended the Orthodox Jewish services already on the schedule at the prison. (*Id.*)

Hamby also called Jay Nelson to testify during his case in chief. Mr. Nelson is currently the warden at Mount Pleasant Correctional Facility. Prior to that he was executive officer for offender services in the state. One of his duties was to serve as the Statewide Spiritual Activities Coordinator, a position which he held from April 2013 until October 2015. His position was the second step in the religious grievance process and the third step in the new religion/religious accommodation process. (Def. Ex. C at 4-6). As Statewide Spiritual Activities Coordinator Mr. Nelson was a member of a nationwide list of religious administrators from DOCs from other states. When reviewing requests concerning the Jewish faith, he would ask the national group for input, as well as asking a rabbi who had served the Mitchellville facility in the past, as well as responding

back to the requesting institution to discuss issues. Mr. Nelson was aware there were differences between sects in Judaism and that some are stricter.

Mr. Nelson received the February 3, 2014 request(s) regarding provision of a non-vegetarian kosher diet and a kosher kitchen. (Ex. F at 43-50). He responded to the individual grievances as a group, indicating he had reviewed the food issue with the Attorney General's office and the inmates had two options: they could eat the vegetarian diet provided or order kosher food from an outside approved source. (*Id.* at 55). Mr. Nelson specifically responded "There is no constitutional right to meat in your diet" and "There is no constitutional requirement to provide a kosher kitchen." (*Id.*) Mr. Nelson testified he responded this way because he was advised there was a kosher diet in place an inmate could use. (Tr. Vol. II [42] at 177). He did not investigate nor explore any security or cost issues which might be associated with the requests because a kosher diet was already in place. (*Id.*) It was Mr. Nelson's understanding that rabbis were part of the *Walker* process to make sure the diet met minimum nutritional standards. (*Id.* at 178). As for the kosher kitchen request, Mr. Nelson understood Hamby to be requesting the same accommodations as former inmate, Glendale More. More had access to a refrigerator and microwave in a common area on his living unit in which he could store foods he purchased through Aleph and could cook himself. (*Id.* at 178-79). Because Mr. Nelson understood Hamby to have access to a microwave and refrigerator in his housing unit, his response that there was no constitutional right to a kosher kitchen was based on the understanding Hamby already had the same access as inmate More. (*Id.* at 180). No cost or security assessment was undertaken because of Mr. Nelson's understanding. (*Id.* at 181).

Hamby was recalled and testified at length regarding the religious underpinnings of his non-vegetarian kosher diet request. Hamby testified he considers himself a member of the Hasidic sect of the Jewish faith and must follow the kosher laws of that sect. He reiterated his request that the Court order a separate area for Jewish kosher kitchen at ISP overseen by a rabbi. (Tr. Vol. II [42] at 193). He thought the cost of such a kitchen could be minimized by "kosherizing" kitchen systems in some of the older units at ISP. (*Id.* at 194-95). With respect to kosher foods for holidays, he believed there was a place in Des Moines which would mail food for holidays, which he would pay for. (*Id.* at 196). Hamby's concern about Hy-Vee providing meals was it would be food prepared and handled by gentiles, which he said was forbidden. (*Id.*) He testified the food prepared at ISP is not adequate as it is handled by gentiles in an unkosher kitchen.

On cross-examination Hamby admitted he did not convert to Judaism until 2003 when he found out his deceased biological father was Jewish. (Tr. Vol. II [42] at 205). Before that time he practiced various religions, including agnosticism, Odin, Druidism. (*Id.* at 205-07). He has many tattoos which pre-date his conversion to Judaism which would not conform to his current beliefs. (*Id.* at 203). Hamby testified he observed a kosher diet while he was at the Bremer County jail from 2007 to 2009. (*Id.* at 210). When he returned to IDOC in May 2009 he was clean shaven, although he testified he had not shaven off his peyot (side curls). (*Id.* at 211). When he first re-entered the IDOC Hamby identified himself as a Christian as he said Messianic Judaism was not on the list of choices. (*Id.* at 212). He did not know if Aleph would assist him in diet or Jewish issues and apparently there are rabbis in Iowa who do not recognize him as a Jewish person. (*Id.* at 214-16). He has declined the prison's offer to send him to an institution with a kosher kitchen as he has family in Iowa and a pending PCR. (*Id.* at 216-17). Hamby testified he underwent a

conversion to Judaism in 2006 with a Rabbi Yakov in Postville, Iowa but has been excommunicated and rabbis want nothing to do with him. (Tr. Vol. III [43] at 236).

After plaintiff rested and defense counsel made a record on a Rule 50 motion, defendants re-called Jay Nelson to testify about IDOC religious programming policies and to explain the religious grievance process. He explained the difference between making a new religion request, Ex. O, and the separate religious grievance form, both of which ultimately are reviewed by the statewide religious committee if appealed. (Tr. Vol. III [43] at 260-263). With respect to the grievance exhaustion issue, Mr. Nelson admitted he made one response to all grievances submitted in Exhibit F and that it was a mistake to do so, but he made the decision to accept the individual complaints as properly filed at the time. (*Id.* at 270, 272-74). He never investigated any security concerns which might arise with Hamby's kosher diet request because there was already a court-ordered diet alternative and Hamby could order from the canteen or an outside vendor at his own cost. (*Id.* at 280-82).

With respect to Hamby's request to change the group name, Nelson testified he viewed that as a request to establish a new religion and advised Hamby to pursue that through the appropriate forms and mechanisms. (Tr. Vol III [43] at 286-87). Hamby did not follow through as suggested. (*Id.* at 287). With respect to Hamby's request for a kosher kitchen, Nelson understood him to be requesting a set-up as inmate More had, which was already in place because Hamby could use a microwave and refrigerator on his living unit. (*Id.* at 289-910).

Defendants next called Christopher Tripp, the food service director at ISP. He testified the ISP kitchens feed breakfast to approximately 900 people daily and lunch and supper to about 1,050 people per meal. (Tr. Vol. III [43] at 298). There is a statewide master menu on a five-week cycle

which offers a regular meal, no-meat meal, medical modified diet, and kosher option. (*Id.*) General population inmates come to the chow hall for meals; inmates in administrative segregation or disciplinary detention are fed on the units and off-site meals are delivered by vehicle. (*Id.* at 299). He testified kosher meals are sent to the living units for consumption as the ISP kitchens are not kosher. (*Id.*) Mr. Tripp has not done a lot of research about how to make the kitchen kosher because of the available kosher option. Based on his understanding, nothing in the kitchens is kosher as every oven, pot, pan, utensil, and dish has been in contact with non-kosher foods. (*Id.*)

To serve a kosher diet, a kosher meal request is input into the computer which prints a ticket on a daily basis per meal and contains instructions for the items to be placed in a food sack and how to package them. (Tr. Vol. III [43] at 300). Kitchen workers place items in plastic bags using latex gloves; other items might be served with a disposable spork. (*Id.*) Mr. Tripp testified one inmate is trained to maintain the kosher preparation and another inmate is trained as back-up. (*Id.* at 302). Correctional staff are present in the kitchen to supervise and monitor the activities of dietary staff. Mr. Tripp testified he regularly conducts audits of food preparation activities to make sure the kosher preparation is being done correctly. (*Id.* at 300-301). Coolers in the kitchen are separated by frozen/meat/dairy and include some preparation coolers. (*Id.* at 311). After they are bagged, kosher diets are placed in a designated shelf in the cooler. (*Id.* at 301-02, 311). Mr. Tripp did not understand the court-ordered kosher diet to be vegetarian and ISP has made substitutions on occasion from items procured through normal sources. (*Id.* at 303). For instance, at one time the IDOC warehouse sent a load of kosher tuna which was used in the sacks until it ran out. ISP purchased a new can opener which was specifically dedicated to opening those cans. (*Id.*). When the Aleph meals are received, they arrive on kosher trucks, leading Mr. Tripp to believe kosher

quality is preserved when served. (*Id.* at 304). Kosher items are available through the ISP canteen, Ex. P, but Mr. Tripp is not part of the commissary process. (*Id.* at 305).

At the time of hearing Mr. Tripp believed there were three inmates taking the kosher diet option, one on court order. (Tr. Vol. III [43] at 305-06). Since 2011 he estimated the largest number of inmates taking the kosher option was up to ten. (*Id.* at 306). To get on the kosher diet list, an inmate needs to make a request through the chaplain or institution religious coordinator. Once verified and approved, Mr. Tripp would put their diet choice into the system. Inmates can choose between the no-meat option and regular meals based on personal preference, but cannot do so with kosher diet. (*Id.*)

The institution does not provide the *Walker* kosher diet for holidays, as the kosher laws are so restrictive that the items in the *Walker* diet do not provide substantial amounts of nutrients or items to be consumed. (Tr. Vol. III [43] at 307-08). Some alterations are made during that period, including obtaining microwaveable meals from Aleph Institute and adding fruits and vegetables to those items. (*Id.* at 308). Inmates are allowed to microwave their own meals in accordance with Aleph's instructions. (*Id.*) The institution has never served kosher beef as they cannot process or cook it in a kosher manner and there is not a kosher kitchen with kosher equipment. (*Id.* at 310).

Mr. Tripp confirmed that inmate More paid for his kosher meals and used a microwave and refrigerator in the common areas of his living unit. (Tr. Vol. III [43] at 313).

On cross-examination Mr. Tripp testified he used Judaism 101 website to research kosher dietary laws and also resources from the religious coordinator and IDOC coordinator. (Tr. Vol. III [43] at 315). When inmates have questioned whether an item is kosher or came from a kosher source, he has invited the inmate to review the item in its container. (*Id.* at 319). The inmate who

prepares the kosher diets is not Jewish. (*Id.*) Mr. Tripp has not researched the cost of building a kosher kitchen. (*Id.*) Mr. Tripp is required by the IDOC and Iowa Department of Administrative Services to make purchases through the state warehouse and he has no control over the items which are purchased by the warehouse. (*Id.* at 320-21).

### III.   APPLICABLE LAW AND DISCUSSION

A.    <u>Exhaustion of Administrative Remedies</u>

Defendants argue that Hamby's claims are barred by the exhaustion requirement of the Prison Litigation Reform Act ("PLRA"), which states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Congress enacted the PLRA to reduce the number of frivolous prisoner lawsuits filed in federal courts, with the end goal of "fewer and better prisoner suits." *Jones v. Block*, 549 U.S. 199, 204 (2007). A prisoner need not plead facts to demonstrate exhaustion in the complaint; rather, the defendant in a prisoner lawsuit may plead failure to exhaust as an affirmative defense. *Jones*, 549 U.S. at 216. This exhaustion requirement applies to claims under RLUIPA. *Cutter v. Wilkinson*, 544 U.S. 709, 723 n.12 (2005).   It also applies to First Amendment claims. *See Pelligrino v. Janklow*, 90 Fed.Appx. 190, 191 (8th Cir. 2004) (per curiam) (First Amendment); *Castano v. Neb. Dep't of Corrections*, 201 F.3d 1023, 1024 (8th Cir. 2000) (Due Process) (noting that the definition of "civil action in prison conditions" in 18 U.S.C. § 3626(g) is broad, and the same definition applies under 42 U.S.C. § 1997e(a)).

Where a prisoner complaint includes multiple claims covering "a wide variety of discrete complaints, about interactions with guards, prison conditions, generally applicable rules, and so

on, seeking different relief on each claim," "[t]here is no reason failure to exhaust on one necessarily affects any other." *Jones*, 549 U.S. at 222. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 220. An inmate satisfies § 1997e(a) by pursuing 'the prison grievance process to its final stage' to 'an adverse decision on the merits.'" *Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015) (quoting *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002) (en banc)).

Defendants' exhaustion argument here is that Hamby did not exhaust to final stage his claims regarding the non-vegetarian kosher diet/kosher kitchen. As developed in the evidence at hearing, Hamby and other inmates involved in the Messianic Jewish group began by submitting separate grievances on these topics. Hamby sent an informal kite regarding non-vegetarian kosher diets and re-establishment of kosher kitchen, specifically, the kitchen facilities provided to inmate Glendale More. (Def. Ex. F at 47, 53). The group members were told to re-file their individual grievances on the topics as "group grievances." (*Id.* at 2). Grievances on the non-vegetarian kosher diet and kosher kitchen were then filed. (*Id*. at 43, 51). Mr. Nelson testified he, likely wrongfully, responded to the grievances as a group. (Tr. at 269-70; Def. Ex. F at 54-55). From that point, the group then appealed his determinations to the Statewide Religious Review Committee as required by the religious grievance policy. (Def. Ex. F. at 68-69, 70-72). The Statewide Religious Review Committee responded on June 10, 2014:

7.   Request to be provided a nonvegetarian diet.
    a.   A vegetarian diet can be provided that is consistent with your religious tenets.
    b.   You may also order Kosher food at your own expense from the institutional canteen or from a vendor approved by your institution.
8.   Request for food prepared in a Kosher kitchen.
    a.   A Kosher kitchen cannot be provided.

(*Id.* at 74). To the extent the state argues Hamby did not individually exhaust because Mr. Nelson responded on a group basis, the Court disagrees. When Mr. Nelson required a group grievance to be filed and then responded to the group grievance, the individual grievance requirement was negated and waived. The Court finds that Hamby has exhausted his administrative remedies as required by the religious grievance policy.

B.     RLUIPA

Congress enacted RLUIPA to provide additional protection for inmates' religious freedom. *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009). RLUIPA establishes a higher standard of review than the standard applied to constitutional free exercise claims. *See Murphy v. Mo. Dep't of Corrections,* 372 F.3d 979, 986 (8th Cir. 2004). RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1-2) ("Section 3"); *see also Holt v. Hobbs*, ___ U.S. ___, ___, 135 S.Ct. 853, 860 (2015).

Under RLUIPA, the plaintiff must establish that the challenged government practices impose a substantial burden on the exercise of a sincerely held religious belief.  42 U.S.C. § 2000cc-1(a); *Holt*, 135 S.Ct. at 862; *Van Wyhe v. Reisch*, 581 F.3d 639, 655 (8th Cir. 2009). "Religious exercise" under RLUIPA extends beyond practices that are "compelled by, or central to" a religious belief system. *Van Wyhe*, 581 F.3d at 655-56 (quoting *Patel v. U.S. Bureau of*

*Prisons*, 515 F.3d 807, 813 n. 7 (8th Cir. 2008)). The exercise of religion may involve the performance of (or abstention from) physical acts for religious reasons. *Burwell v. Hobby Lobby*, ___ U.S. __, ___, 134 S. Ct. 2751, 2770 (2014). A particular religious belief need not be shared by all members of a religious sect in order to be protected under RLUIPA. *Holt*, 135 S. Ct. at 862-63. With respect to sincerity,

> Although RLUIPA bars inquiry into whether a particular belief or practice is central to a prisoner's religion, it does not preclude inquiry into the sincerity of a prisoner's professed religiosity. (Citation omitted). The "truth" of a belief is not open to question; rather, the question is whether the objector's beliefs are truly held.

*Cavanaugh v. Bartelt*, 178 F. Supp. 3d 819, 828 (D. Neb. 2016)(citing *Cutter v. Wilkinson*, 544 U.S. 509, 725 n.13 (2016) and quoting *Burwell*, 134 S. Ct. at 2779).

Under RLUIPA the plaintiff also bears the burden of showing that a prison policy has substantially burdened the sincerely held belief. *Holt*, 135 S.Ct. at 862. To constitute a substantial burden, the government action "'must significantly inhibit or constrain [religious] conduct or [religious] expression . . .; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.'" *Van Wyhe,* 581 F.3d at 656 (quoting *Patel*, 515 F.3d at 813 & n.7).

If the plaintiff makes the threshold showing, then the burden shifts to the government to show that the challenged policy or procedure is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000-1(a) (1) – (2); *Holt*, 135 S.Ct. at 863. Order, safety and security are compelling government interests in a prison environment that may justify restrictions on religious practices under RLUIPA. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). RLUIPA " ' "requires the Government to demonstrate that

the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." ' " *Holt*, 135 S. Ct. at 863 (quoting *Hobby Lobby*, 134 S. Ct. at 2779, quoting in turn *Gonzales v. O Centro Esperita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430-31 (2006)). Because RLUIPA is more protective of religious exercise than the First Amendment, the availability of alternative means of practicing religion will not necessarily satisfy the least restrictive means requirement under RLUIPA. *Holt*, 135 S. Ct. at 862. The Court will consider each of these elements in turn.

1.      Hamby's Sincerity

The state challenges the sincerity of Hamby's religious Hasidic Jewish beliefs, pointing to his previous history of affiliation with the Lutheran religion in his grandparents' household; his past practices of atheism, agnosticism, Odin, and Druidism; the presence of an antichrist symbol tattooed on his stomach; and his past criminal history involving defacement of a church when he was 18. (Tr. Vol. II [42] at 201-208).

Hamby's testimony regarding his identification as Jewish was credible. While it is true he has had a checkered religious past, he has been consistent in his attempts to practice his Hasidic Jewish (or Messianic Jewish) faith since at least after 2009 (he initially self-identified as Christian upon re-entering the IDOC at that time). He follows a version of Jewish doctrine and studies Jewish religious literature. The Court finds that Hamby is sincere in his religious beliefs.

2.      Religious Practices and Substantial Burden

The Court must next determine whether Hamby met his burden to show that the dietary practices he seeks to engage in are grounded in his sincerely held religious belief. *See, e.g., Holt*, 135 S.Ct. at 862 (noting that the prisoner must show that "the relevant exercise of religion is

grounded in a sincerely held religious belief"); *see also Native American Council of Tribes v. Weber*, 750 F.3d 742, 748 (8th Cir. 2014) ("[t]he inmate must show that the government's practice imposes (1) a substantial burden (2) on a *religious* exercise."). The Court will examine each contested practice in turn.

Hamby's own testimony was the only evidence presented at the hearing relating to the necessity of food laws to his religion. Hamby identified his spiritual advisor as Hillel Zeilin, who died in 1942 and pioneered the set of Jewish principles to which Hamby adheres. Hamby also testified that he has been in touch with an Orthodox rabbi in Cleveland, Ohio, but did not provide any specifics about what that rabbi had advised.

A religious practice need not be "central" to a prisoner's belief to be protected under RLUIPA. *Van Wyhe*, 581 F.3d at 656 (citing *Cutter*, 544 U.S. at 725 n. 13). The Eighth Circuit has observed that RLUIPA does "not demand doctrinal justification to support the desired religious exercise, but the inmate does bear the burden of establishing a *substantial* burden on a religious exercise." *Van Wyhe*, 581 F.3d at 657 (emphasis in original).

It is apparent from Hamby's testimony that he wishes to adopt a set of practices relating to daily meals that are particularly strict – much stricter than those adopted by other Jewish inmates. He cited as Biblical basis for his request for a non-vegetarian kosher diet Genesis Chapters 6-9 which Hamby testified commanded the Jews to eat meat without blood found in it. (Tr. at 189, ll. 11-15). The Court takes judicial notice that this particular scriptural citation involves God's directions to Noah regarding the animals to be taken on the Ark and does reference that meat should not be eaten with blood. Fed. R. Evid. 201. The Court also is aware that Jewish food law requires special processing of meat products, special treatment with respect to separation of meat

and dairy products, and dedication of utensils/cookware/serving dishes to only kosher foods. The testimony of Mr. Tripp confirms that understanding. On the record before the Court, Hamby has not established that he must eat a non-vegetarian kosher diet as part of the religious beliefs of the Jewish sect to which he claims membership. To the extent that Hamby requests a kosher kitchen (including as limited to the facilities provided to inmate More), he has shown that kosher preparation is grounded in his sincerely held religious beliefs.

The Court next turns to the question of whether the IDOC's provision of only a vegetarian kosher diet, the ability to order kosher food items from the commissary, and denial of a kosher kitchen (even in the limited context of inmate More's former food preparation), constitute a substantial burden on Hamby's exercise of his religious beliefs, that is, does this conduct " '. . . significantly inhibit or constrain [religious] conduct or [religious] expression . . .;  . . . meaningfully curtail a person's ability to express adherence to his or her faith; or . . . deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.'" *Van Wyhe,* 581 F.3d at 656 (quoting *Patel*, 515 F.3d at 813 & n.7). There is evidence that ISP does not consider the *Walker* diet to be only vegetarian and that staff include some form of protein in the diet sacks, at one time substituting kosher tuna. Also, it appears Hamby has the ability to microwave kosher foods in microwaves maintained in the common areas of his living unit. To the extent that Hamby can obtain a vegetarian kosher diet through the prison kitchen (with kosher preparation procedures being followed as described by Mr. Tripp) or purchase kosher items from the commissary, the Court finds the prison has not substantially burdened his exercise of the dietary laws of his religion. Furthermore, according to Mr. Schierbrock Hamby can petition to have ISP

approve a kosher vendor that meets the institution's security considerations from whom he can order other kosher items.

        2.        Compelling Government Interest/Least Restrictive Means

Because the Court previously found that Hamby has not met his burden to show that the prison policies at issue substantially burdened his sincerely held beliefs, the Court does not need to reach the compelling government interest issue as it relates to the non-vegetarian kosher meal and kosher kitchen requests.

C.      <u>First Amendment</u>

Although prison inmates are protected under the First Amendment to the U.S. Constitution, their rights are subject to limitations "in light of the needs of the penal system." *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 831 (8th Cir. 2009) (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004)). "To be valid, 'a prison regulation [which] impinges on inmates' constitutional rights . . . [must be] reasonably related to legitimate penological interests.'" *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). If an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a significant burden on religious exercise, the inmate's First Amendment Free Exercise claim must fail as well. *Van Wyhe*, 581 F.3d at 657-58. Given the Court's finding on Hamby's RLUIPA claim, Hamby also has not proven his First Amendment Claim.

D.      <u>Remedy</u>

As noted initially, the only form of relief to which Hamby could be entitled is injunctive relief as his claims do not qualify for monetary damages under 42 U.S.C. § 1997e(e). Furthermore, RLUIPA claims for money damages against state defendants, even in their official capacity, are

barred by sovereign immunity. *Sossaman v. Texas*, 563 U.S. 266, 290 (2011). A plaintiff seeking permanent injunctive relief must demonstrate: (1) actual success on the merits; (2) irreparable harm if an injunction is not issued; (3) the harm to the plaintiff outweighs any possible harm to others flowing from the issuance of an injunction; and (4) an injunction serves the public interest. *Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011); *Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). An injunction is an equitable remedy, and should be issued "only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010). The first factor is resolved as the Court has found Hamby has not prevailed on the merits of his RLUIPA and First Amendment claims concerning kosher diet with kosher meat and/or provision of a kosher kitchen. Accordingly, the Court need go no further in its analysis.

## REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that judgment be entered as follows:

1.      All claims against defendants John Baldwin, Jerry Bartruff, Sheryl Dahm, Nick Ludwick, Rebecca Bowker, Julie Johnson, Debbie Nichols, Jill Johnson, Debbie Ferril, David DeGrange, Randy VanWye, and Nikki Eaves be dismissed.

2.      Hamby has abandoned his claim that Kehot Publication be an approved religious literature vendor and his claim for holy day worship service dates and times.

3.      Hamby is not entitled to monetary damages, as such claims are barred by 42 U.S.C. § 1997e(e).

4.      The Court should find that Hamby has not established his claims under RLUIPA

and the First Amendment regarding provision of a kosher diet with meat and a kosher kitchen. Judgment should be entered in favor of defendants Michael Schierbrock and Jay Nelson and against Hamby.

IT IS ORDERED that the parties have until **September 5, 2017** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

Dated this 22d day of August, 2017.

Helen C. Adams
Chief U.S. Magistrate Judge